## APPEAL OF SPHAR BRICK CO.

Docket No. 2086.   Submitted May 1, 1925.   Decided October 21, 1925.

Upon the evidence submitted, *held*, that taxpayer is entitled to a paid-in surplus of $13,967.23 in respect of cash and accounts receivable, but is not entitled to a paid-in surplus in respect of plant, equipment, and clay deposits.

*George M. Morris, Esq.*, for the taxpayer.
*Benjamin H. Saunders, Esq.*, for the Commissioner.

Before JAMES, LITTLETON, SMITH, and TRUSSELL.

This is an appeal from the determination of a deficiency in income and profits tax for the calendar year 1919 in the amount of $2,890.17, arising from the refusal of the Commissioner to allow a paid-in surplus in respect of assets paid in for stock on July 1, 1912, and to allow a deduction for depreciation and depletion based upon the March 1, 1913, value claimed by taxpayer.

It was stipulated that the July 1, 1912, value, as determined by the Board for invested capital purposes, would be accepted by the parties as the value on March 1, 1913, for the purpose of depreciation and depletion.

### FINDINGS OF FACT.

Taxpayer is a Kentucky corporation organized July 5, 1912, with a capital stock of $50,000, par value $100 per share. The predecessor of taxpayer was the Sphar Pressed Brick Works, Inc., a corporation organized in 1904 under the laws of West Virginia, with a capital stock of $100,000, par value $100 per share, of which $90,000 was paid in in cash.

Taxpayer was organized for the purpose of taking over the entire assets and business of the predecessor corporation, of engaging in the manufacture of a new and different kind of brick, and of seeking a new and more profitable market than that which existed for the pressed brick theretofore manufactured. The entire stock of the taxpayer was issued to the stockholders of the predecessor corporation at the time of the transfer of the assets; one share of stock being issued for two shares of the predecessor.

Prior to the organization of the taxpayer there had been dissatisfaction on the part of the stockholders with the management of the

predecessor corporation. It had operated since 1904 with indifferent success, declaring dividends of only 5 per cent in the years 1910 and 1911. Pressed brick was going out of use and there was practically no market for it. Some of the stockholders desired to discontinue the manufacture of pressed brick and take up the manufacture of rough texture faced brick and seek nearby markets. From 1904 until a short time prior to the reorganization the principal stockholders of the predecessor corporation were S. M. Hall, owner of 38 per cent, A. C. Sphar, owner of 33⅓ per cent, and E. A. Robinson, owner of 25 per cent. The remaining stock was owned by M. T. Miles, W. N. Stockton, and A. S. Clark. About the year 1909 Hall, the principal stockholder and former secretary and treasurer, quarreled with Sphar, from which time they were not on speaking terms. He did not go near the plant until March, 1912, when he visited it with his attorney for the purpose of examining the books with a view of instituting court proceedings. As a culmination, however, of negotiations with Sphar, Hall sold his stock to Sphar at $45 per share in June, 1912. Robinson also became dissatisfied with his investment and in June, 1912, sold his stock to Miles and Clark for $40 a share. The stockholders thereupon organized the taxpayer, which took over the entire assets and business of the old corporation as of July 1, 1912. Taxpayer operated successfully from the start and declared dividends of 15 to 20 per cent each year.

At the time of the transfer of the assets by the predecessor corporation to the taxpayer no appraisal was made of the property. H. T. Miles, secretary and treasurer, who knew very little about bookkeeping, set up on the books of taxpayer an opening balance sheet as follows:

ASSETS.

| | |
|---|---|
| Real estate and machinery | $30,000 |
| Merchandise | 20,000 |

LIABILITIES.

| | |
|---|---|
| Capital stock | $50,000 |

This balance did not include the following:

| | |
|---|---|
| Cash in bank and on hand | $4,252.69 |
| Notes and accounts receivable | 9,766.54 |
|     Total | 14,019.23 |
| Accounts payable | 52.00 |
|     Balance | 13,967.23 |

Taxpayer now claims that the balance sheet as prepared by the secretary and treasurer as of July 1, 1912, was erroneous, and that the plant, equipment, and clay deposit were not set forth at their

true value. In the year 1922 taxpayer employed an appraisal engineer to make a retrospective appraisal of the assets as of July 1, 1912, and March 1, 1913, for invested capital, depreciation, and depletion purposes. The engineer fixed the net value of the plant and equipment as of July 1, 1912, based upon the cost less accrued depreciation, at $69,047.88, and that of March 1, 1913, at $81,500; the value of the real estate and clay deposit for invested capital at $46,150. The value as of July 1, 1912, of $127,650 claimed for the entire assets was allocated as follows:

| | |
|---|---:|
| Plant and equipment | $81, 500 |
| Depleted acreage, 3.5 acres at $200 | 700 |
| Plant site and barren acreage, 12.6 acres at $200 | 2, 520 |
| Reserve acreage, 25 acres at $200 | 5, 000 |
| Clay deposit, 21 acres | 37, 930 |
| Total | 127, 650 |

This value did not include cash on hand and accounts receivable, less accounts payable, amounting to $13,967.23, and bricks on hand of the value of $20,000.

The appraiser's value of the plant and equipment was based upon information contained in the books of the taxpayer and the predecessor corporation, information obtained from the officers of the corporations, and a personal inspection of the plant, equipment, and acreage. He arrived at the value of the entire property by assuming the value of the property as a whole to be the present worth of an annuity represented by eventual earnings discounted over the life of the property at a fair rate of interest. He figured the life of the property at 50 years and a fair rate of interest to be 6 per cent. Using an annuity formula, he computed an annuity of $8,100, discounted at 6 per cent over a life of 50 years, would be $8,100×15.760, or $127,650. He arrived at the value of the clay deposit by subtracting from the total value of $127,650 the value which he ascribed to the plant and equipment, depleted acreage, plant site, barren and reserve acreage. Summarized, his method of computing the value of the clay deposit was as follows:

| | | |
|---|---:|---:|
| Present worth | | $127, 650 |
| Depleted acreage | $700 | |
| Present site and barren acreage | 2, 520 | |
| Reserve acreage | 5, 000 | |
| Plant and equipment | 81, 500 | |
| | | 89, 720 |
| Value of clay deposit | | 37, 930 |

The clay deposit was of good quality and so situated as to be economically utilized for manufacturing brick by the present plant and equipment.

He computed depletion of clay deposit at the rate of 22.5 cents per 1,000 bricks, and depreciation of the acreage included in the plant site and barren acreage at boundaries at the rate of 2 per cent annually over the life of the property, attributing neither depletion nor depreciation to the acreage held in reserve.

Neither depreciation of assets nor depletion of clay deposit was taken by the predecessor corporation, nor by the taxpayer, until the present controversy. It was stipulated at the hearing that the July 1, 1912, and the March 1, 1913, value of depreciable assets should be the same for invested capital, depreciation, and depletion purposes, and that neither depreciation nor depletion should be considered between those dates. It was also stipulated at that time that the rate of depreciation should be 5 per cent annually, and that depletion should be at a rate per 1,000 bricks. The Commissioner held that the value of the assets paid in on July 1, 1912, had not been shown to have been clearly and substantially in excess of the par value of the stock issued therefor and refused to allow a paid-in surplus; furthermore, that taxpayer had not established a value on March 1, 1913, for depreciation and depletion purposes, in excess of $30,000.

### DECISION.

The deficiency should be computed in accordance with the foregoing findings of fact and the following opinion. Final determination will be settled on consent or on 10 days' notice, in accordance with Rule 50.

### OPINION.

LITTLETON: The issue presented in this appeal concerns the value which should be ascribed to certain tangible assets of the taxpayer for invested capital, depreciation, and depletion purposes for the year 1919. The Commissioner determined that the assets paid in on July 1, 1912, did not have a value in excess of the par value of the stock issued therefor and refused to allow a paid-in surplus. He determined that the March 1, 1913, value of depreciable and depletable assets was $30,000, the value at which they were shown on the books at the time of transfer. The taxpayer relies upon the retrospective appraisal made in the year 1922, as of July 1, 1912, and March 1, 1913.

It was stipulated that, for the purposes of this appeal, the July 1, 1912, value, as determined by the Board for invested capital purposes, and the March 1, 1913, value, for depreciation and depletion purposes, should be the same.

Taxpayer was organized on or about July 1, 1912, with a capital stock of $50,000, with shares having a par value of $100 each,

the stock being issued in payment for the entire assets of the Sphar Pressed Brick Works, Inc. The present controversy arises from the contention by the taxpayer that the assets paid in for stock of taxpayer on July 1, 1912, had an actual cash value at that time clearly and substantially in excess of the par value of the stock issued therefor, and that its opening balance sheet did not reflect the actual cash value at that time. Taxpayer contends that the value of $30,000, at which the real estate and machinery was set up on its books, was erroneous, and that the true value should be measured by a certain retrospective appraisal made in 1922, which, if followed, would give the entire assets a value on July 1, 1912, as follows:

Plant and equipment_____ $81,500.00
Real estate and clay deposit_____ 46,150.00
Merchandise (bricks)_____ 20,000.00
Cash_____ $4,252.69
Notes and accounts receivable_____ 9,766.54
                                              _____
                                              14,019.23
Less accounts payable_____ 52.00
                                              _____ 13,967.23
                                                          _____
    Total _____ 161,617.23

thereby entitling taxpayer to a paid-in surplus of $111,617.23. Taxpayer further contends that it is entitled to depreciation upon the March 1, 1913, value of the plant and equipment of $81,500, and to depletion at the rate of 22.5 cents per unit of 1,000 bricks.

Section 326 of the Revenue Act of 1918 provides:

SEC. 326. (a) That as used in this title the term "invested capital" for any year means  *  *  *

    *        *        *        *        *        *        *

(2) Actual cash value of tangible property, other than cash, bona fide paid in for stock or shares, at the time of such payment, *but in no case* to exceed the par value of the original stock or shares specifically issued therefor, unless the *actual cash value* of such tangible property *at the time paid in* is shown to the satisfaction of the Commissioner to have been *clearly and substantially* in excess of such par value, in which case such excess shall be treated as paid-in surplus:  *  *  *.  [Italics ours.]

It is incumbent upon the taxpayer to show that the actual cash value of the tangible assets at the time paid in was clearly and substantially in excess of the par value of the stock issued therefor.

The engineer employed by the taxpayer in 1922 to appraise this property as of July 1, 1912, and March 1, 1913, appears to have performed his task with thoroughness and care. He determined his value in accordance with the method of computing values by the formula which he used. There are several very important factors, however, which do not appear to have been taken into consideration in this appraisal and which must be considered aside from the mere

mathematical computations and formulæ. We refer particularly to the significant phrases in the statute relative to invested capital, namely, "actual cash value at the time paid in" and "clearly and substantially in excess of the par value of the stock issued." This language of the statute requires a careful consideration of every element affecting the value of the assets at the time paid in for stock, in this instance on July 1, 1912. The predecessor corporation had been manufacturing bricks since 1904 with little success, the market for pressed brick having declined gradually until there was practically no demand for the product. Some of the stockholders desired to reorganize the business, but the majority were dissatisfied and desired to dispose of their holdings. Under these circumstances two of the stockholders owning 63 per cent of the stock sold their stock to the other stockholders for $40 and $45 per share, respectively, whereupon the remaining stockholders formed a new corporation, to which the predecessor corporation sold its entire assets for stock of a par value of $50,000. These facts, in our opinion, have an important bearing upon the actual cash value of the property on July 1, 1912, the date paid in for stock of the taxpayer, and strongly indicate the actual cash value at that time. As a plant for the manufacture of pressed brick it was of exceedingly doubtful value. As a plant with changes necessary for the manufacture of rough-texture faced brick it had only a potential value, dependent upon future events. The evidence shows that the appraiser did not take these facts into consideration in arriving at his values, but shows that he predicated his value as of July 1, 1912, upon subsequent developments which perhaps warranted a value in subsequent years in excess of that paid for the assets in 1912. The appreciation in value, however, can not be included in computing the invested capital.

The appraiser ascertained that the average output of brick for the years of operation from 1912 to 1921 was 3,750,000 bricks. From the books of the company he averaged the net income for the years 1912, 1913, and 1914, and set up for the year 1913 an average profit per 1,000 bricks at $2.40, or an annual profit of $8,100. He assumed the value of the property as a whole to be the present worth of an annuity represented by eventual earnings discounted over the life of the property at a fair rate of interest. He figured the life of the property to be 50 years and a fair rate of interest to be 6 per cent. Using an annuity formula, he computed an annuity of $8,100, discounted at 6 per cent over a life of 50 years as being $8,100×15.760, or $127,650. It is obvious that this value, which is based entirely upon earnings subsequent to incorporation, in view of the evidence before us, should not be accepted as the actual cash value on July 1, 1912. We do not know what the production or earnings were for years prior to July 1, 1912. The appraiser averaged the net income

for the years 1912, 1913, and 1914. The evidence shows that the taxpayer declared a dividend of 15 per cent for the fractional year July 1 to December 31, 1912, and that the years 1913 and 1914 were also very successful years, but, prior to this time, the predecessor corporation had not been operating successfully and had declared no dividends except for the years 1910 and 1912, at which time the dividends were 5 per cent. The appraiser did not take into consideration the fact that the predecessor corporation was manufacturing pressed brick which was rapidly going out of use for building purposes; that the stockholders were dissatisfied with the operation of the predecessor corporation and were investigating a new field of manufacturing rough texture faced brick; that at least two of the principal stockholders were unwilling to take the chance of continuing their investment in this manner. We find that Hall, the principal stockholder, at a very short time prior to the transfer of the assets, sold his stock for $45 a share, and that Robinson sold his stock for $40 per share. Hall's and Robinson's holdings represented approximately 63 per cent of the total stock. The sales of this stock were made under conditions of extreme hostility. Hall had not been on speaking terms with Sphar, and had even gone so far as to employ an attorney for the purpose of instituting court proceedings, so it must be assumed that he obtained all he possibly could for his stock and that Sphar did not pay any more than was necessary to obtain it. Another significant fact that should be taken into consideration is that the new corporation (the taxpayer) was capitalized at $50,000, which was slightly in excess of the sale price of the stock of the predecessor corporation, and that the officers of the taxpayer actually entered upon its books the value of the assets as equal to the par value of the stock issued.

We are of the opinion from all of the evidence that the actual cash value of the real estate, plant, and equipment at the time paid in was $30,000; that the total cash value for invested capital purposes of the entire assets so paid in on July 1, 1912, for $50,000 of stock was $63,967.23, the excess of the value of the entire assets over the stock issued therefor being the cash and accounts receivable, less accounts payable, of $13,967.23 which the taxpayer is entitled to include in invested capital as paid-in surplus.

With respect to depreciation and depletion, it was stipulated that the July 1, 1912, value, as determined by the Board for invested capital purposes, should be accepted as the value on March 1, 1913, for depreciation and depletion purposes, and that such depreciation should be allowed at the rate of 5 per cent per annum with depletion on a unit basis of 1,000 bricks. We have determined under the evidence submitted that the value of depletable and depreciable assets on July 1, 1912, was $30,000. There is no evidence before

the Board showing what portion of the $30,000 represented depreciable and what portion represented depletable assets, and we must, therefore, approve the allocation of the Commissioner regarding such assets, subject to the increase of depreciation from 3 per cent to 5 per cent per annum.